ANNE NICHOLS and Another, Appellants, *v.* HURTIG & SEAMAN
    THEATRICAL ENTERPRISES, INC., and Others, Respondents,
    Impleaded with LEE SHUBERT and Others, Defendants.

First Department, June 4, 1926.

Theatres and shows — action by authors of play to restrain production
    in England — agreement authorized managers to produce in England
    under direction of named person — said person refused to produce —
    under contract plaintiffs had duty of finding another producer — after
    expiration of last extension of time managers procured another pro-
    ducer — plaintiffs through representative agreed to new producer on
    terms of original contract — managers made contract with producer
    and play was presented — plaintiffs because of dispute over another
    contract attempted to cancel present contract — time of production
    was waived — formal contract was not required — injunction denied.

The plaintiffs, the authors of a play, are not entitled to an injunction restraining
    the defendants from the production of the play in England on the theory that

the defendants did not comply with their contract to produce the play within the time specified, since it appears that the contract called for the production of the play under the supervision of a named person; that in case said person refused to produce the play the plaintiffs would procure another producer; that said person did refuse to produce the play; that after the expiration of the last date of the extension formally agreed to by the parties, the managers, to whom the plaintiffs granted the production rights, interested another London producer and that producer and the managers had a conference with the plaintiffs' representative in Paris; that the plaintiffs were agreeable to having the play produced by the person selected by the managers and informally agreed to its production in England on the terms of the original contract; that in all the negotiations following the expiration of the last date of the extension of time all of the parties continued to treat the contract as in existence and did not disaffirm the contract or serve notice of termination; that following the understanding reached in Paris, the London producer proceeded to engage a theatre and prepared the play for presentation to the public and presented it; and that the understanding reached in Paris was confirmed by telegram and letter but no formal contract was entered into.

Under the circumstances, taking into consideration that the plaintiffs concede that the failure of the managers to produce the play within the time stipulated was not due to the fault of the managers; that all of the parties considered the contract as continuing and the arrangement finally made as carrying out the terms of the contract; that the action of the plaintiffs in finally denying the right of the managers to produce the play in London was based on a dispute over an entirely different contract, and that the Paris conference did not provide for any new terms or conditions, it must be held that there has been no violation of the contract by the managers; that the extension of time for production was waived by the parties, and that in equity and good conscience the plaintiffs are not entitled to restrain the production of the play in England under the terms of the contract.

A stipulation made at the Paris conference that a contract drawn by the plaintiff's New York attorneys would be necessary, is immaterial, for all the terms of a valid contract were present in the original contract and the extension by the Paris conference.

APPEAL by the plaintiffs, Anne Nichols and another, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk ·of the county of New York on the 18th day of April, 1925, upon the report of a referee appointed to hear and determine the whole issues.

*M. L. Malevinsky* of counsel [*Benjamin Pepper* with him on the brief; *O'Brien, Malevinsky & Driscoll,* attorneys], for the appellants.

*David C. Myers* of counsel, for the respondents.

DOWLING, J.   The action was brought ·to obtain a permanent injunction restraining the defendants, and each of them, from producing the play " Just Married " in certain portions of the British Empire.   The plaintiffs are the authors of the play, which,

prior to April 2, 1920, they placed in the hands of a play broker named Jay Packard. Through him as broker the play was sold to Hurtig & Seaman Theatrical Enterprises, Inc., under an agreement dated April 2, 1920, whereby the latter, termed therein the " Manager," and hereinafter so referred to, acquired the license from the plaintiffs, called therein the " Authors," and so styled hereinafter, to produce the play in the United States and Canada, in consideration of the usual royalties paid by managers to authors, and upon the terms and conditions set forth in the agreement. Under paragraph 15 thereof there was granted to the " Manager " the option of acquiring the rights to produce and present this same play, " Just Married," in specified portions of the British Empire, under the terms and conditions provided therein. On April 28, 1921, the manager elected to exercise the option granted in paragraph 15 and thus acquired the license known as the " British Rights." Among others, paragraph 15 contained the following condition: " The manager agrees to produce or present the said play or cause to be produced or presented within one year from the date exercising this option, and if the said play is not so produced or presented within said time, it shall revert immediately to the Authors." The manager, therefore, was obliged to produce the play in the specified territory before April 28, 1922. Prior to that date, and on or about March 14, 1922, the authors agreed in writing to an extension of time within which the manager was required to produce the play, to December 31, 1922. On December 21, 1922, a modification agreement was entered into in writing between the authors and " What's Your Name Co., Inc.," the latter having succeeded to all of the rights in the original contract by assignment from Hurtig & Seaman Theatrical Enterprises, Inc., with the consent of the authors. This contract contained, among others, the following clauses:

" *First.* That the right to produce said play in England, Ireland, Scotland and Wales is subject to the right of Charles B. Cochran of London, England, to join with the Assignee in the production of said play upon the basis of Fifty per cent (50%) of the production rights in said territory to the said Charles B. Cochran, and fifty per cent (50%) to the Assignee.

" *Second.* In the event the said Charles B. Cochran elects not to join in said production as herein specified, the Authors shall have the right and privilege of securing and naming an English producer reasonably satisfactory to the Assignee, to take the place of said Charles B. Cochran.

" *Third.* Said play must be produced on or before May 1st, 1923, and time and performance, as well as each and every covenant

of the contract of April 2nd, 1920, or of this contract, are of the essence of this agreement."

Under the terms of this agreement, the time to produce expired May 1, 1923.

On April 30, 1923, the day preceding the expiration of the license, a new contract was entered into in writing between the parties. This agreement recited that the parties thereto were the authors, Anne Nichols and Adelaide Matthews, parties of the first part, Hurtig & Seaman Theatrical Enterprises, Inc., party of the second part, "What's Your Name Co., Inc.," party of the third part, and Charles B. Cochran, of London, Eng., party of the fourth part. The contract was never signed by Charles B. Cochran, but only by the first three parties thereto. It extended the time to produce for another six months, from May 1, 1923, until November 1, 1923.

Under date of October 17, 1923, the following letter was sent to Anne Nichols, one of the plaintiffs, by her attorney:

"October 17, 1923.

" ' Just Married '
    " Miss ANNE NICHOLS,
        " Fulton Theatre Bldg.,
            " 210 West 46th Street,
                " New York City.
                    " Attention — Mr. Robert C. Kay.

" DEAR MISS NICHOLS.— This is to bring to your attention the suggestion of Mr. Myers, of Myers & Kutner, that you and Miss Matthews and Mr. Hurtig and myself get together in a conference in respect to ' Just Married.'

" Mr. Myers says that Gilbert Miller was and he thinks still is anxious to do this play. Would it be feasible to make an appointment for some day next week? Please let me know.

" You will remember that the time to produce expires, I think, November 1st, and inasmuch as the failure to produce has not been due to Hurtig or Shubert, we should extend the time.

                    " With kindest regards,
                        " Yours sincerely,
" MLM:EH                                            M. L. M."

No conference was had as a result of this letter. In the spring of 1924, at a meeting between respondent Hurtig and Miss Nichols, the former testified that the following conversation was had between them, after a discussion involving the purchase of the road rights for " one-night stands " for the play " Abie's Irish Rose," of which Miss Nichols was the author: " Prior to leaving Miss Nichols, I incidentally said to Miss Nichols, ' What are you doing about

the producer for " Just Married " in London? ' She was still waiting for Mr. Cochran, but she said she was going to England a little later on, and if Mr. Cochran was not ready to produce, why, she would find someone else. I said ' I am going to England, too, and I will look for someone.' She said, ' That is fine.' That was practically our conversation."

Under date of May 19, 1924, Cochran wrote Hurtig as follows:

" As I told you this afternoon the interests are so split up and there will be so little left for the producer, that I do not see my way clear to give ' Just Married ' a London representation. I hold the production at your disposal and await your instructions.

" I am very pleased to have met you and hope we shall have an opportunity of doing some business together in the future."

Thereafter Mr. Hurtig conferred with Ernest Edelsten, another London producer, and Mr. Edelsten tentatively agreed to act as the producer of " Just Married." On the 3d or 4th of July, 1924, Hurtig telegraphed Miss Nichols in Paris, asking permission to confer with her on Sunday, July fifth. He received, in reply, a telegram from William de Lignemare, who stated that he was Miss Nichols' general manager and that he would confer with Hurtig at the Hotel Majestic in Paris on July 5, 1924. On that date Hurtig and Edelsten arrived in Paris to confer with de Lignemare. What occurred at that meeting is a matter of controversy. De Lignemare's version of the interview is, briefly, as follows: " Mr. Hurtig asked me first if I could represent Miss Nichols in this transaction. I said that I had full power to represent her and made it very plain to him that, however, whatever we would agree to, would have to be first of all submitted to her before anything could go on; that furthermore, we would have to keep up to a certain contract if we wanted to go into this deal; that he had lost his right to ' Just Married,' but that I knew that it was Miss Nichols' idea that it should be treated in a friendly spirit, and that if he could suggest something to me that was agreeable to her, I would take care of the matter. I tried to get in touch with her and therefore he would have — he could not have an answer on that Sunday."

Hurtig replied that he was in a great hurry. He introduced Edelsten to de Lignemare and asked if the latter had any objection to Edelsten as the London manager to produce " Just Married." De Lignemare said they ought to get up a plan, and after telephoning to Miss Nichols, he would see " if that would be the tentative agreement." Hurtig replied that he was in a hurry to produce the play because he wanted to get the services of Linn Overman therein, and he could accomplish that by seeing Lee

Shubert, who was then in Paris.   De Lignemare said Miss Nichols would want to supervise the London production and to have twenty-five per cent of the show under a new agreement.   De Lignemare further testified:  " I then turned to Mr. Edelsten and told Mr. Edelsten that Mr. Edelsten must understand very well that ' Just Married ' belongs to Anne Nichols and Adelaide Matthews; that I did not want anything to be put over on anybody; that we wanted this deal to be done in the spirit embodied in the contract, and, therefore, nothing could be done unless we had a contract drawn up by O'Brien, Malevinsky & Driscoll, who were her lawyers; that I would have no other contract drawn, but one by O'Brien, Malevinsky & Driscoll, and that was absolutely — that was made very plain and Mr. Edelsten answered me then that no business could go on unless it was done in the proper spirit and that everybody had to be very fair.   I said, ' That is the way I understand the game myself; if you want to play that way we will play, and if you do not play that way we won't play at all.' Mr. Edelsten laughed, and said, ' Good-bye.'   I took them to the door and sent them back where they wanted to go; I think they were even going down to see Lee Shubert right away — I am not sure of that, but as far as I remember they were.   They drove down in my car."   An appointment was made for the next morning at the Hotel Majestic, and de Lignemare was then to have ready " some kind of an agreement signed or letter or note by Miss Nichols."   Hurtig said de Lignemare's word was good enough for him, but he preferred to have a letter signed by Miss Nichols.

The meeting between the same three persons took place the next morning as agreed.   De Lignemare testified:   " We went into a little private room at the Majestic Hotel where we could be quiet, just the three of us.   I said to Mr. Hurtig and Mr. Edelsten conjointly that to lose no time I had drawn up a paper, a memorandum paper, which I wanted them to read — which I wanted to read aloud to them; that if that was agreeable to them I would have it signed by Miss Nichols, and would send it to Mr. Hurtig.   I made it very plain to Mr. Hurtig and Mr. Edelsten that the show could not be produced in London before the contract was entered into and drawn by Malevinsky, O'Brien, Malevinsky & Driscoll; that, therefore, there was no reason to expect us to go to London before the contract was signed; no reason for us to go there and then told them — I read to them the letters, his memo in pencil in which I said — "

And further he testified:   " I read to them this paper in which I said that first of all we wanted to have supervision of the play in London; that we did not want Mr. Storke in the play; that the

contract had to be drawn by O'Brien, Malevinsky & Driscoll; it had to be signed by Mr. Hurtig, Miss Anne Nichols, Miss Adelaide Matthews, Mr. Edelsten and the Shuberts."

And again: " Q. Just there let me ask you was any objection made to the points that you had set forth in this memorandum? A. No objections were set forth as far as this agreement was concerned except Mr. Hurtig insisted on getting a letter signed by Miss Nichols, and I said that I would do it as quick as I could; as I possibly could."

Hurtig testified that on July fifth, when he met de Lignemare in the lobby of the hotel in Paris, he asked the latter: " ' Where is Miss Nichols? ' He said, ' She is out somewheres outside of Paris, near Paris.' ' Isn't she here? ' ' No.' I said, ' Where is Miss Matthews?' He said, ' She is with Miss Nichols.' ' Then I can't see them.' I said, ' I want you to meet Mr. Edelsten, Mr. Ernest Edelsten, the London producer. Mr. Edelsten has agreed to produce Just Married in London.' Mr. de Lignemare said, ' I have heard of Mr. Edelsten.' I said to Mr. de Lignemare, ' Does Miss Nichols want to retain the 25 percent interest for the London production according to the contract that we have? ' He said, ' I think Miss Nichols would want her 25 percent.' I said, ' Do you think that Miss Nichols will be satisfied with Mr. Edelsten as the London producer?' He says, ' I think so, but I would rather talk with Miss Nichols.' That was about all the conversation that we had in connection with this particular meeting, except to make an appointment for the next day to have breakfast together. In the meantime he was to motor out and see Miss Nichols."

At the meeting on the following morning, Hurtig's version of what occurred is as follows: " Mr. de Lignemare saw Miss Nichols, or at least, he said he saw Miss Nichols, and he took up the matter of Mr. Edelsten as the London producer, and also the 25 percent interest that she insisted on keeping,   *   *   *   the same as she had under the contract; and there was nothing more discussed excepting that I said to him after our breakfast —   Q. What did he say Miss Nichols had directed him to tell you?   A. That Mr. de Lignemare said to Mr. Edelsten and I that Miss Nichols was satisfied with him as the London producer, but she insisted on her 25 percent —   Q. Retaining the 25 percent?   A. Retaining the 25 percent interest in the London production.   That was said to Mr. Edelsten and it was said to me.   Q. What else did Mr. de Lignemare say?   A. Mr. de Lignemare said that — that was practically all he said in connection with it, excepting that it was satisfactory to Miss Nichols."

8

He further testified: " After our breakfast, before leaving, I said to Mr. de Lignemare, ' Now, will you please have Miss Nichols confirm this with a letter, so that you can get it to me to London by tomorrow or the next day,' and he promised that he would send me a letter signed by Miss Nichols confirming the understanding of that day. * * * I explained to Mr. de Lignemare that I was sailing on, I believe, the 13th or 14th, because my reservation was made on the Leviathan, and I was sailing on that day. I said to Mr. de Lignemare, ' I would like to have that letter as soon as I possibly can get it, because I must close this contract with Mr. Edelsten,' and Mr. de Lignemare said, ' Go right ahead and close your contract, everything is all right, and I will have the letter to you tomorrow.' He positively impressed me with the fact that he was going to have it to me the next day, but I never received any letter, of course."

Edelsten made an affidavit, which by stipulation was accepted in lieu of his testimony. He swore: " Mr. Hurtig and I left London for Paris and met Mr. de Lignemare in Paris on Sunday, July 6th. I was introduced by Mr. Hurtig and Mr. de Lignemare stated that he was delighted to meet me because Miss Nichols had in mind a new play of hers now in New York which she would like to have produced in England and that he would arrange for Miss Nichols to call at my office in August to talk over the production of this new play in addition to the play ' Just Married.' Mr. de Lignemare stated at that interview with Mr. Hurtig and me that he was delighted to have me handle the play and take over the production and that he had full authority from Miss Nichols to agree to substitution of my firm for that of Mr. Cochran's, and that I should go right ahead and make my arrangements accordingly; Mr. Hurtig stated that he would like to have the matter confirmed further, but Mr. de Lignemare stated that that was not necessary, but after having a talk with Miss Nichols he would either write or telegraph, but that I need waste no time but to proceed and make arrangements for the production; he asked me if I knew that Miss Nichols was to have a 25 percent interest for which he was to contribute her 25 percent share and I told him that I was familiar with the agreement in respect to that and in respect to the royalties and the matter of production and that it was agreeable to me. Mr. de Lignemare stated that he and Miss Nichols expected to be in London in August and that they both would call on me to take up any details in reference to the production of ' Just Married ' and to assist me in such manner as they could."

Hurtig and Edelsten left Paris and returned to London on or

about July 9, 1924, and entered into a written agreement for the production of the play, which, among other things, secured and agreed to pay to the authors not only the royalties provided in the original contract between the " authors " and the " manager," but also provided for the issue to Miss Nichols of twenty-five per cent of the stock of the company to be organized for the London production, as she desired.

On July fourteenth Hurtig sailed from England for the United States on board the *Leviathan.*  Hurtig testified that on the way to Cherbourg he wrote to de Lignemare chiding him for his failure to procure the letter from Miss Nichols.  Hurtig testified the letter was dictated in the morning and mailed the same day at Cherbourg.  The letter itself is dated " At Sea, July 15th." De Lignemare testified that this letter was received only about August first.  It is admitted that on July thirteenth de Lignemare sent the following telegram to Edelsten in London for Jules Hurtig, which was relayed to him by radio to the *Leviathan:*

" 6.41 London T. 29
" JULES HURTIG Passenger S/S Leviathan:
                              Southampton.  Dock.
  " Received telegram as follows:   Wire your address Hotel Des Thermes Brides Les Bains Savoie   Everything OK William De Lignemare Engaging Westcent."

De Lignemare testified that at the same time he sent this telegram, he procured a letter signed by Anne Nichols, dated July 13, 1924, which he mailed to Mr. Hurtig in London on that day, though he must have known Hurtig had already sailed for America at that time.  This letter was a duplicate of the one which follows. The latter is a letter which he obtained from Miss Nichols dated eight days later and mailed to Hurtig in New York.  It is as follows:
                              " Hotel Des Thermes
                  " Brides-Les-Bains, le. 21st of July, 1924.
" Mr. JULES HURTIG
      " Strand Theatre Building
            " Broadway
                  " New York City
                        " U. S. A.
  " DEAR SIR.— It will be perfectly agreeable to us to produce ' Just Married ' in London in connection with Mr. Ernest Edelsten providing that we are reserved 25% of the profits, we to give 25% of our share and that we get the customary royalties.  We want

to supervise the London production to be staged under my personal supervision.

" This letter will only be valid when a contract embodying the spirit of this letter will be drawn and signed respectively by:

" Miss Anne Nichols

" Miss Adelaide Matthews

" Mr. Jules Hurtig

" Mr. Lee Shubert

" Mr. Ernest Edelsten.

" The London management will belong to Mr. Ernest Edelsten who will use in consultation with us his best judgment as to leasing a theatre and taking one on sharing basis.

" We shall apply to this contract the same clauses contained in the last contract drawn by O'Brien, Malevinsky and Driscoll relative to the production of ' Just Married ' in London.

" The production of ' Just Married ' will have to be made before March 1st, 1925, otherwise this letter and the contract drawn by O'Brien, Malevinsky and Driscoll will be void.

" Very truly yours,

" ANNE NICHOLS."

Meantime, while on the ocean, Hurtig wrote the following letter, above referred to:

" ' At Sea '

" July 15, 1924.

" Mr. William De Lignemare

" Hotel Des Thermes Brides,

" Les Bains Savoie, France.

" Dear Sir.— After our conference in Paris you promised to have a letter to me the following day. But after your assurance that everything was all right I made contract with Edelsten. I was somewhat disappointed in not hearing from you as per your promise. Your telegram, however, was received at the London office and transmitted to me to the boat. You evidently forgot I was sailing on the 14th. Mr. Edelsten whose office address 125 Shaftesbury Avenue, will be glad to see you and Miss Nichols when you arrive in Lond.

" Trusting this finds you both well and happy and with very best wishes.

" Yours very truly,

" JULES HURTIG.

" P. S. My New York cable address is ' Vaudvillus ' New York."

Nothing further occurred, until plaintiff's attorney wrote the following letter to the " manager's " attorneys:

"*August* 6, 1924.

" Messrs. Myers & Kutner,
         " 70 W. 40th Street,
               " New York City.

" Dear Sirs.— There is now due $12,500 on account of ' Just Married.' We not only received no check, but get no response either from your firm or from Hurtig.

" If this matter is not cleaned up within the next ten days, I shall bring an action.

" Incidentally, Mr. De Lignemare has written me in respect to the execution of a new contract on account of the London production of ' Just Married.' In view of the attitude of Jules Hurtig and your firm, I shall advise Miss Nichols not to renew that contract.

                    " Very truly yours,
                         " M. L. MALEVINSKY."

Correspondence followed between the attorneys after the manager's attorneys had sent to Miss Nichols' attorney in response to this letter a check for $8,437.50, as her half share in receipts for the stock rights of " Just Married," less a commission of ten per cent, which had been deducted as brokerage. Mr. Malevinsky, as attorney for Miss Nichols, objected to such deduction and refused to accept the check as payment, but wrote the manager's attorney on August 8, 1924, that he would " hold this money temporarily as trustee." In the letter so informing the manager's attorney, he added: " Very likely I am going to leave for Paris on the 28th of August, and will meet Miss Nichols abroad. The balance of this money should be paid, including the 10% that is taken out, before I go away. Otherwise, I shall certainly advise Miss Nichols as heretofore indicated."

Again on October 17, 1924, Malevinsky wrote to the manager's attorney demanding payment of this balance, and most significantly said therein: " Furthermore, this is to notify you that unless this money is paid in full that the ' Just Married ' London contract is entirely off and will not be considered any further under any circumstances. If the money that is due is paid we must draw a contract in respect to ' Just Married ' in accordance with the suggestions heretofore made by Mr. De Lignemare. This is final." This letter is most significant as establishing two things: *First,* that Mr. Malevinsky was trying to use the British rights contract as a means of forcing payment of the brokerage in another transaction between the parties here; *second,* that nothing was to be altered or changed in the terms of the agreement made in Paris between de Lignemare, Hurtig and Edelsten.

Meantime, Edelsten proceeded with the arrangements for the production of the play under the terms of the agreement in writing between himself and Hurtig hereinbefore referred to, and the play was actually produced outside of the city of London on December 1, 1924, and in London on December 15, 1924, and was still continuing its run there at the time of the rendition of the report of the referee herein.

Upon these facts the learned referee at the close of the case dismissed the complaint as against the defendants Shubert, and to this plaintiffs' attorney consented. Over the defendant Edelsten, the court concededly never acquired jurisdiction. As to the remaining defendants, the referee said in his opinion:

" I find that there are valid contractual relations between the plaintiffs and the defendants defining their respective rights and obligations in connection with the ' British Rights ' to the play, and if any party claims a breach thereof, the remedy is such appropriate action in law or equity as the facts may warrant.

" It is true, as asserted by counsel for the plaintiffs that a wrongful trespass on the property or rights of another cannot establish a right to such property or rights; but when the owner of property bargains away a substantial interest therein by contract, new rights are created which the law, and in proper cases, equity, will protect.

" The solemn engagements of the plaintiffs evidenced by three formal written contracts drawn with care. and with a view to plaintiffs' pecuniary profit in the performance thereof by the defendants, confirmed in every essential detail by the conference of July 7, 1924, the telegram of July 13, 1924, and plaintiffs' subsequent acts and acquiescence, no less solemn because informal, may be neither lightly set aside, nor unauthorized burdens or conditions imposed thereon nor hindrances put in the way of performance by *ex parte* acts or declarations — after the other party has in good faith entered on performance. (*Carns* v. *Bassick*, 187 App. Div. 283.) "

In my opinion the conclusions thus formulated by the referee are fully warranted by the evidence. There was a valid agreement between " authors " and " manager " for the British production of the play, and the entire record demonstrates beyond a possibility of doubt that, despite the extensions of time of such production and the failure to sign a written extension of time to cover the agreement made with de Lignemare on the authors' behalf, both authors, manager and every one concerned regarded and treated the written agreement as continuing in full force and effect after the last date to which its performance had been postponed in

writing, and in good faith intended to live up to its terms and accept its rights, duties and responsibilities until the authors' New York attorney, Mr. Malevinsky, for reasons having nothing whatever to do with the contract in question, first threatened to advise Miss Nichols not to renew it, and then apparently succeeded in inducing her to accept his advice.

The written agreement dated December 21, 1922, provided that: " In the event the said Charles B. Cochran elects not to join in said production as herein specified, the authors shall have the right and privilege of securing and naming an English producer reasonably satisfactory to the assignee, to take the place of said Charles B. Cochran." In my opinion this provision not merely gave the right and privilege to the authors to secure and name an English producer satisfactory to the assignee in case Cochran refused to act, but imposed that duty on them as well. They could not sit idly by, refrain from naming a new producer when Cochran declined, and thus arbitrarily terminate a contract and end the manager's rights thereunder.

As a matter of fact, the managers did all the work of securing another producer in place of Cochran, one who was admittedly satisfactory to the authors, and who proceeded with the production of the play with apparent success. No one has suggested that Edelsten did not in every way measure up to the necessities of the situation, nor has his good faith in his work, or the good faith of the managers in selecting him, been attacked in any way.

While it is clear and undisputed, even by the testimony of de Lignemare himself, that a new understanding and verbal agreement was reached by him, as Miss Nichols' representative, and Hurtig at Paris on July seventh, yet I do not agree entirely with the learned referee's conclusion (Forty-eighth finding of fact): " That the time within which to produce in England was extended to March 1st, 1925, by agreement between the parties made on July 7th, 1924," for I do not believe that de Lignemare, without Miss Nichols' express consent, could make such an agreement, nor did it become effective until Miss Nichols confirmed it herself, as she certainly did on July twenty-first, and much earlier, according to de Lignemare's testimony. But the following conclusions of fact found by the referee are amply supported by the testimony:

" *Forty-ninth.* That both of the parties continued to treat the contracts as in existence and neither of them disaffirmed such contracts or served any notice to terminate the same.

" *Fiftieth.* That the defendants were permitted to engage a theatre and the various persons to produce the play and to enter into contracts for its production before the commencement of this

action and without any notice of any intention to terminate or disaffirm the contract.

" *Fifty-first.* That in so far as time of performance of any of the covenants contained in the written agreements between the parties was of the essence of the agreements, it has been waived by the acts, consent and acquiescence of the parties."

These conclusions find confirmation in de Lignemare's cablegram to Hurtig at London, relayed to him by radio to the *Leviathan,* saying " Everything O. K.," which, in view of their Paris consultations could mean nothing except that Miss Nichols had accepted and approved in its entirety the agreement reached there by Hurtig, Edelsten and de Lignemare.   Every one then regarded an actual agreement as having been reached, and they acted accordingly.   The manager proceeded with the production under Edelsten's direction, and the authors made no protest, complaint or repudiation until their attorney concluded to destroy the agreement, for reasons having no connection therewith.   De Lignemare himself testified: " Q. When you came back to America last year, you met Mr. Malevinsky and you were quite willing to make a contract with Mr. Hurtig or Mr. Edelsten, weren't you?   A. I was always willing to make a contract.   Q. It was Mr. Malevinsky who advised you against it, wasn't it, yes or no, please?   Didn't he advise against making any contract with Mr. Hurtig, yes or no? A. Yes, he advised not to make any contract with Mr. Hurtig. Q. Didn't he say that he would not permit Miss Nichols to make an agreement with Mr. Hurtig because Hurtig — he accused Mr. Hurtig of holding out $1,250 of moneys received from the stock rights; wasn't that the reason, yes or no?   Wasn't that the reason he gave, yes or no?   A. Yes, he gave that reason."

While de Lignemare testified that there would have to be a new contract drawn up by Miss Nichols' attorneys in New York, Messrs. O'Brien, Malevinsky & Driscoll, there is not the slightest suggestion of any provision which would have been omitted, changed or added to the original contracts already drawn by them.   In fact, Miss Nichols' letter to Hurtig of July 21, 1924, said: " We shall apply to this contract the same clauses contained in the last contract drawn by O'Brien, Malevinsky and Driscoll relative to the production of ' Just Married ' in London."   There was no necessity for a new written contract, once Miss Nichols assented and agreed to the agreement made between Hurtig, Edelsten and de Lignemare, save to formally insure the extension of the period of production for the protection of the manager in case the authors tried to repudiate it or deny its existence.   The terms as to the payment of royalties and the twenty-five· per cent share in the

profits already agreed on, and confirmed by Miss Nichols in that letter, were actually inserted in the agreement made in London by Edelsten and Hurtig.

In this connection, I find myself unable to agree with so much of conclusion of fact " twenty-second " as holds that, by reason of the letter of Malevinsky to Miss Nichols, dated October 17, 1923, a copy of which the former sent to the attorneys for the manager, the manager " might rest assured that the time to produce would be extended indefinitely for a reasonable time pending negotiations, and such was the effect of the said letter and of the copy inclosed; that the said letter and the inclosure were sent by authority of the plaintiffs and their attorney's authority so to do, and to give the extension, has not been repudiated, nor has the said letter been revoked; and thereby the time to produce the said play was extended indefinitely for a reasonable time beyond November 1, 1923." I do not see how that letter can be regarded as anything more than the attorney's opinion expressed to his client that, as the delay in production was in no way due to the manager, his time to avail himself of the right to produce should be formally extended. But while not in itself constituting an extension of time, it does confirm the view that the contract should be regarded as a continuing and operative one, and which was to continue effective until a reasonable time had been given to obtain a new producer, which the authors had failed to do, as in my opinion they were bound to do under the original contract, so that the delay in performance was really of their own making.

We have here an action in equity. The plaintiffs sought relief from such tribunal in order to obtain equitable relief against defendants by way of injunction to restrain the production abroad of a play in which the authors had granted such rights by a formal written agreement. If the producer originally selected refused to proceed, it was the authors' duty to select a new one. But they failed so to do, and the manager was obliged to carry out this duty, which he did to the satisfaction of the authors. All the necessary and essential terms of a new formal agreement for an extension of time were agreed upon by the manager, the producer and the representative of the authors. These terms embraced everything the authors desired to have embraced in the contract. They were confirmed by the authors, and the manager was so advised. Ordinarily the transaction would have ended there as all parties were acting in entire good faith and to their mutual advantage. The manager had made a contract with the accepted producer, embodying therein all the necessary provisions for the payment of the moneys agreed to be paid to the authors for royalties in

profits. The arrangements for the production were proceeding as usual. The letter of the author, Miss Nichols, on July twenty-first made certain additional requirements which were immaterial and trivial, and had no bearing on the main terms of the contract, nor did the alleged requirement of the authors' representative that a written agreement be drawn here by the authors' attorneys suggest that any new provisions be added to those of the former contract, nor is there any such suggestion of additional terms in this record. Every one interested regards the contract as in full continuing force and effect, and while no definite time had been fixed, a reasonable·time for performance was assumed to have been granted, in view of the conceded fact that the delay was not due to any fault of the manager. As a matter of fact, the British production was made within five months after the producer found by the manager had been accepted by the authors. There is no suggestion that such interval was not a reasonable time in which to act, nor that the production as ultimately given was not in every way adequate. With the parties content to accept the contract as continuing and the manager acting in good faith to perform it, the attorney for the authors, because of a disagreement with the manager about deducting a brokerage fee from the authors' share of the receipts under an entirely separate and distinct contract between them (having no relation to the contract in question here), first advises the manager's lawyers that he will advise his client not to renew the present contract, and then later writes threatening that unless the amount deducted is paid before he leaves for Paris, he would see Miss Nichols there and advise her not to renew. We are not concerned with the merits of that dispute, which were not in issue here. Certainly it afforded neither justification nor excuse for the repudiation by the authors of the contract which they had treated as continuing and to continue thereafter for a reasonable time, and which by their acts, writings and representations they had induced the manager to regard as equally existent for the protection of his rights as of their own. The interference of their lawyer in the situation cannot relieve the authors of their responsibilities under a situation which they had largely helped to create, nor destroy the effect of their own acts which had estopped them from denying the existence of a contract, to be performed within a reasonable time, at least, in reliance upon which the manager acted, made his own contract with the British producer, and embarked his funds in the venture. Of the financial solvency of the respondents there is no question raised. My conclusion is that the appellants are not entitled to any relief from a court of equity by way of disaffirmance of their contract or the extensions

thereof, whether verbal or in writing, but on the contrary all the equities of the case are with the respondents, who have acted throughout in good faith.

The judgment appealed from should, therefore, be affirmed, with costs.

CLARKE, P. J., MERRELL and McAVOY, JJ., concur.

Judgment affirmed, with costs.